Receipt number AUSFCC-7293440

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ALLIANT HEALTH PLANS, INC. )<br>)<br>)<br>  Plaintiff, )<br>)<br>v. )<br>)<br>THE UNITED STATES OF AMERICA, )<br>)<br>  Defendant. )<br>_____) | No. __21-1769 C__ |

## COMPLAINT

Plaintiff Alliant Health Plans, Inc. ("Plaintiff" or "Alliant") brings this action against Defendant, the United States of America ("United States," or "Government"), and alleges the following:

## INTRODUCTION

1. Alliant brings this action to recover amounts that the Government owes Alliant under the Government's mandatory cost-sharing reduction ("CSR") payment obligations established by Section 1402 of the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 and its implementing federal regulations.

2. In March 2010, the United States enacted The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, and The Health Care and Education Reconciliation Act, Pub. L. No. 111-152 (collectively, the "ACA").

3. The ACA requires individuals to purchase coverage if they are not otherwise insured, but also created a support system of federal subsidies to offset the costs of coverage. The ACA's individual mandate, coupled with the availability of federal subsidies, was designed to realize the ACA's twin goals of increasing both the availability and affordability of health

insurance coverage. Together, they dramatically increased the number of individuals – many previously uninsured – purchasing health insurance. To help serve the vastly expanded pool of individuals seeking coverage, the ACA also established health insurance exchanges – online marketplaces where individuals and small groups may purchase health insurance. Created by Title I, Subtitle D of the ACA, the health insurance exchanges are designed to bring together buyers and sellers of insurance, with the goal of increasing access to coverage offered in a competitive marketplace.

4. Health insurance issuers selling insurance on the exchanges are required to offer qualified health plans in the individual and small group markets. A qualified health plan ("QHP") is a health plan that meets certain criteria established by the Centers for Medicare & Medicaid Services ("CMS") in order to be sold to consumers through the exchanges.

5. The ACA classifies plans offered on the exchanges in one of four levels – silver, gold, platinum, and bronze – based on their cost-sharing requirements: the coinsurance, copayments, and deductibles a policyholder must pay out-of-pocket until satisfying a maximum in a benefit year[1] as established by regulation. 42 U.S.C. § 18022(d); 45 C.F.R. § 156.130.

6. A "silver" plan is a plan structured so that the insurer pays approximately 70% of the average enrollee's health care costs, leaving the enrollee responsible (before the application of the subsidy) for the other 30% through cost sharing. 42 U.S.C. § 18022(d). Under the ACA, an insurer must reduce cost sharing for eligible individuals enrolled in "silver" plans through an exchange. *Id.* § 18071(c)(2).

---

[1] A "benefit year" is "a calendar year for which a health plan provides coverage for health benefits." 45 C.F.R. § 155.20.

7. In a "gold" or "platinum" plan, the insurer bears a greater portion of health care costs, while under a "bronze" plan, the insurer is responsible for a lower portion of those costs. *Id.* An insurer that offers coverage on an exchange is required to offer at least one plan at both the "silver" and "gold" levels of coverage. *Id.* § 18021(a)(1)(C)(ii). The ACA does not require insurers to reduce cost sharing for individuals enrolled in "gold," "platinum," or "bronze" plans.

8. To realize the goal of making affordable health insurance available to low- and moderate-income Americans, the ACA, among other things, established an integrated program of subsidies to defray both the premium expenses and out-of-pocket costs of health insurance with two main components: premium tax credits and cost-sharing reductions.

9. First, Section 1401 of the ACA provides premium tax credits for qualified individuals with household incomes between 100% and 400% of the federal poverty level who purchase health insurance through the exchanges. 26 U.S.C. § 36B. Because these tax credits are refundable, they can subsidize insurance purchased by individuals who have no income tax liability. *See* Congressional Budget Office ("CBO"), *Refundable Tax Credits* at 1 (Jan. 2013), *available at* https://www.cbo.gov/sites/default/files/113th-congress-2013-2014/reports/43767_RefundableTaxCredits_2012_0_0.pdf. The vast majority of individuals who buy insurance on an exchange rely on advance payments of these premium tax credits. *See King v. Burwell*, 135 S. Ct. 2480, 2493 (2015).

10. Second, and most pertinent here, Section 1402 of the ACA requires insurers to provide "cost-sharing" reductions to individuals who are enrolled on a silver plan on the exchanges and whose household income is below 250% of the federal poverty level. 42 U.S.C. § 18071(c)(2), (f)(2). As noted above, "cost-sharing" refers to out-of-pocket payments to health care providers in the form of copayments, coinsurance, and deductibles that individuals are typically required to pay

under their insurance plan. *See* CBO, *Key Issues in Analyzing Major Health Insurance Proposals* at 15-17 (Dec. 2008), *available at* www.cbo.gov/publication/41746.

11. Insurers, in turn, are guaranteed by the ACA to be reimbursed by the Government for the cost-sharing reductions they provide to their insureds. Specifically, the ACA requires that the Secretaries of Health and Human Services ("HHS") and the Treasury "***shall make*** periodic and timely payments to the [QHP] issuer equal to the value of the reductions." 42 U.S.C. § 18071 (emphasis added). These advance payments are made directly to health insurance issuers. *Id.* § 18082(a)(3).

12. Alliant insures individuals and groups within Georgia under the bronze, silver, gold, and platinum plans.

13. Federal and state regulations do not permit health plans, such as Alliant, to raise premiums mid-benefit year (as opposed to prospectively) to cover the cost of providing the cost-sharing reductions.

14. In an October 12, 2017 memorandum, HHS Acting Secretary Eric Hargan informed CMS that "CSR payments to issuers must stop, effective immediately."[2] According to the memorandum, this instruction was premised upon a legal opinion of the U.S. Attorney General concluding that the CSR program lacked a valid appropriation.

15. The Government's failure to pay CSR reimbursements deprives QHP issuers, including Alliant, of money to which they are entitled by statute on account of their performance in the exchanges for benefit year 2017. CBO estimated CSR payments of approximately $7 billion

---

[2] Oct. 12, 2017 Mem. from E. Hargan to S. Verma re Payments to Issuers for Cost-Sharing Reductions (CSRs), *available at* https://www.hhs.gov/sites/default/files/csr-payment-memo.pdf.

for fiscal year 2017.³ Regardless of whether Congress appropriated sufficient funds to HHS to make the CSR payments, the Government's statutory obligation to make such payments, and Alliant's right to those payments, remains.

16. This identical issue has been litigated successfully by other QHP issuers. Those issuers sued the Government alleging that they were entitled to damages because the Government had failed to reimburse them for cost-sharing reductions they made in the final months of 2017. Their lawsuits made their way to the United States Court of Appeals for the Federal Circuit, where the Federal Circuit sided with the QHP issuers, holding that "the cost-sharing-reduction reimbursement program imposes an unambiguous obligation on the government to pay money and that the obligation is enforceable through a damages action in the Court of Federal Claims under the Tucker Act[.]" *Sanford Health Plan v. United States*, 969 F.3d 1370, 1372-73 (Fed. Cir. 2020); *Cmty. Health Choice, Inc. v. United States*, 970 F.3d 1364, 1367 (Fed. Cir. 2020) ("In these cases, following our decision in *Sanford*, we affirm the Claims Court's decisions as to liability. As in *Sanford*, we conclude that the government is not entitled to a reduction in damages with respect to cost-sharing reductions not paid in 2017.").

17. The Government petitioned the U.S. Supreme Court for a writ of certiorari, which the Court denied on June 21, 2021. *See ME Com. Health Options v. United States*, No. 20-1162, 2021 WL 2519118 (U.S. June 21, 2021), and *United States v. ME Com. Health Options*, No. 20-1432, 2021 WL 2519119 (U.S. June 21, 2021).

---

³ *See* CBO, Federal Subsidies Under the Affordable Care Act for Health Insurance Coverage Related to the Expansion of Medicaid and Nongroup Health Insurance: Tables from CBO's January 2017 Baseline at 4, *available at* https://www.cbo.gov/sites/default/files/recurringdata/51298-2017-01-healthinsurance.pdf.

18. Accordingly, by this lawsuit, Alliant seeks full payment of the CSR payments it is entitled to under the ACA and that the Government currently owes. Pursuant to the Federal Circuit's decisions in *Sanford Health* and *Community Health Choice*, the law is clear, and the Government must abide by its statutory obligations. Alliant respectfully asks the Court to compel the Government to do so.

## JURISDICTION AND PARTIES

19. This Court has jurisdiction over this action under the Tucker Act, 28 U.S.C. § 1491(a)(1). The statutory cause of action giving rise to this Court's Tucker Act jurisdiction is Section 1402, a money-mandating statute that requires payment from the federal government to QHP issuers that satisfy certain criteria. Section 156.430 is a money mandating regulation that implements Section 1402 and thus also obligates payment from the federal government to QHP issuers that satisfy certain criteria. *See* 45 C.F.R. § 156.430.

20. In the alternative, the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101 et seq., a money-mandating statute, provides Alliant a cause of action that gives rise to this Court's jurisdiction pursuant to the Tucker Act.

21. This controversy is ripe because HHS has refused to pay Alliant the full amounts owed for CSRs as required by Section 1402, Section 153.460, and the parties' implied-in-fact contract.

22. Alliant is a non-profit corporation organized and existing under the laws of the State of Georgia. Alliant offers Qualified Health Plans under the ACA in Georgia. Alliant is a QHP issuer as defined in 45 C.F.R. § 155.20 (previously defined as an "Issuer").

23. The Defendant is the Government, acting through CMS (or CMS's parent agency HHS). Unless otherwise noted, references in this Complaint to CMS include HHS where applicable.

## FACTUAL ALLEGATIONS

### The ACA's Cost-Sharing Reduction Program

24. The ACA imposed certain obligations on the federal government to help incentivize the participation of private insurers, stabilize premiums, and induce the uninsured to purchase health insurance coverage. Relevant to this dispute, the ACA established a cost-sharing reduction subsidy, paid preemptively to certain qualified insurers, to facilitate the core statutory mission of providing affordable health care to low- and moderate-income Americans.

25. Section 1402 of the ACA, as codified at 42 U.S.C. § 18071, created the CSR program. In relevant part, that Section states:

> (a) In general. In the case of an eligible insured enrolled in a qualified health plan –
>
> > (1) the Secretary shall notify the issuer of the plan of such eligibility; and
> >
> > (2) the issuer **shall reduce** the cost-sharing under the plan at the level and in the manner specified in subsection (c).
>
> [ . . . ]
>
> (c)(3) Methods for Reducing Cost-Sharing
>
> > (A) In general. An issuer of a qualified health plan making reductions under this subsection shall notify the Secretary of such reductions and **the Secretary shall make periodic and timely payments to the issuer equal to the value of the reductions.**

See 42 U.S.C. § 18071 (emphasis added).

26. HHS implemented the CSR payments in the Code of Federal Regulations at 45 C.F.R. § 156.430. In relevant part, Section 156.430 states that "[a] QHP issuer **will receive periodic**

*advance payments* based on the advance payment amounts calculated in accordance with § 155.1030(b)(3) of this subchapter." (emphasis added). Section 155.1030(b)(3) and other regulations set forth the calculation methodologies applicable to CSR payments.

27. Following the ACA's implementation, the Government established a CSR reimbursement schedule under which the Government would provide the required periodic advance payments to QHP issuers. See 42 U.S.C. § 18082; 45 C.F.R. § 156.430(b)-(d). The reimbursements are then periodically reconciled to the actual amount of cost-sharing reductions made to enrollees and providers. 45 C.F.R. § 156.430(c). Specifically, CMS established "a payment approach under which HHS would make monthly advance payments to issuers to cover projected cost-sharing reduction amounts, and then reconcile those advance payments at the end of the benefit year to the actual cost-sharing reduction amounts."[4] "After the close of the benefit year, QHP issuers must submit to HHS information on the actual value of the cost-sharing reductions provided" and HHS "would then reconcile the advance payments and the actual cost-sharing reduction amounts."[5] Finally, the Government would reimburse the QHP issuer "any amounts necessary to reflect the CSR provided or, as appropriate, the issuer [would] be charged for excess amounts paid to it."[6]

---

[4] CMS, HHS Notice of Benefit and Payment Parameters for 2014 (Mar. 11, 2013), at 7, *available at* https://www.cms.gov/CCIIO/Resources/Files/Downloads/payment-notice-technical-summary-3-11-2013.pdf.
[5] *Id.*
[6] CMS, Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Years 2014 and 2015 (Mar. 16, 2016), at 28, *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/CMS_Guidance_on_CSR_Reconciliation-for_2014_and_2015_benefit_years.pdf; *see also* 45 C.F.R. 156.430(e).

### Alliant Participated in Exchanges and Set Prices in Reliance on the Cost-Sharing Reduction Payments

28. For QHP issuers to participate on the marketplaces for the 2017 benefit year, they had to submit their premiums to the appropriate state or federal regulatory authority during May 2016 and submit a signed Qualified Health Plan Issuer Agreement ("QHPIA") to CMS by the end of September 2016.[7] Alliant timely submitted a signed QHPIA, and by doing so committed itself to offering health insurance coverage on the exchange for benefit year 2017. Because the QHPIA has limited termination rights, and because terminating the QHPIA under any circumstance does not obviate the issuer's obligations under state law to continue coverage for enrollees who purchased the plan, Alliant's commitment to the 2017 marketplace was effectively irrevocable as of the end of September 2016.[8]

29. Alliant committed itself to participating in the marketplace in 2017 with the express understanding – based on the plain text of Section 1402 and the Government's actions in previous benefit years – that, for those plans that required the issuers to reduce cost-sharing obligations of the enrollee, the Government would honor the statutory mandate of periodic and timely payments to the issuer equal to the value of the reductions. And in fact, in accordance with that understanding, the Government made monthly advance payments from January 2014 up and until October 2017. It was not until October 12, 2017 – over a year after Alliant had committed itself irrevocably to the 2017 exchange – that the Government first announced that it would not make CSR payments for the remainder of the 2017 benefit year.

---

[7] CMS, Key Dates for Calendar Year 2016: QHP Certification in the Federally-facilitated Marketplaces; Rate Review; Risk Adjustment and Reinsurance (Dec. 23, 2015), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Final-2016-key-dates-table-April-2016.pdf.
[8] *See* 45 C.F.R. § 147.106(b).

**Appropriations for Cost-Sharing Reduction Reimbursements**

30. Section 1401 of the ACA added a new section to the Internal Revenue Code that provided eligible insureds with premium tax credits to cover their health insurance premiums. 26 U.S.C. § 36B. The ACA also amended 31 U.S.C. § 1324, which establishes a permanent appropriation of "[n]ecessary amounts . . . for refunding internal revenue collections as provided by law," including "refunds due from" specified provisions of the tax code. 31 U.S.C. § 1324. Specifically, Section 1401 of the ACA amended the list in Section 1324 to include "refunds due from" Section 36B. 26 U.S.C. § 36B. Until October 2017, the Government relied on the appropriation in Section 1324 to pay amounts owed under both Sections 1401 and 1402.

31. In its April 2013 budget request to Congress for fiscal year 2014, the Office of Management and Budget ("OMB") included a request for a line-item appropriation designating funds for the payment of cost-sharing reductions. *See* Fiscal Year 2014 Budget of the United States Government, Appendix at 448 (Apr. 10, 2013). The same day, HHS separately submitted its justification to Congressional Appropriations committees stating that "CMS requests an appropriation in order to ensure adequate funding to make payments to issuers to cover reduced cost-sharing in FY 2014." *See* HHS, Fiscal Year 2014, CMS, Justification of Estimates for Appropriations Committees at 184 (Apr. 10, 2013).

32. Congress did not provide the line-item appropriation requested by HHS. *See* S. Rep. No. 113-71, 113th Cong. at 123 (July 11, 2013). Congress never repealed or amended the CSR provision, however, and the October 2013 legislation references the existence of CSR reimbursements. *See* Continuing Appropriations Act, 2014, Pub. L. No. 113-46, Div. B, § 1001(a), 127 Stat. 558, 566 (Oct. 17, 2013) (requiring HHS to certify that a program was in place to verify

that applicants were eligible for "premium tax credits . . . and reductions in cost-sharing" before "making such credits and reductions available").

33. In January 2014, HHS began making monthly advance payments to reimburse QHP issuers for cost-sharing reductions,[9] relying on Section 1324 as the appropriation for these payments.[10]

34. Congress has never included any language in appropriations or other bills preventing HHS, CMS, or the Treasury from assessing certain funds or accounts to make CSR payments.

### The Government's Refusal to Reimburse CSRs

35. Although the Government continued to make CSR reimbursements for most of 2017, it decided in October 2017 to stop doing so, arguing that 31 U.S.C. § 1324 could not be used to fund CSR reimbursements. The Department of Justice concluded that Section 1401 premium tax credits and Section 1402 CSR reimbursements were two distinct programs, and the permanent appropriations in Section 1324 only provided funding for the Section 1401 premium tax credits. *See* Oct. 11, 2017 Ltr. from Att. Gen. Sessions to Secretary of Treasury and Acting Secretary of HHS. The next day, HHS announced that it would stop making CSR reimbursements "until a valid

---

[9] *See* CMS, Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Years 2014 and 2015 (Mar. 16, 2016), at 27 ("Payments to issuers of estimated monthly amounts began in January 2014."), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/CMS_Guidance_on_CSR_Reconciliation-for_2014_and_2015_benefit_years.pdf.

[10] *See* Letter from Sylvia M. Burwell, Dir., OMB, to Senators Ted Cruz and Michael S. Lee, at Responses p. 4 (May 21, 2014), ("cost-sharing subsidy payments are being made through the advance payments program and will be paid out of the same account from which the premium tax credit portion of the advance payments for that program are paid"), *available at* http://www.cruz.senate.gov/files/documents/Letters/20140521_Burwell_Response.pdf.

appropriation exists." Oct. 12, 2017 Mem. from E. Hargan to S. Verma re Payments to Issuers for Cost-Sharing Reductions (CSRs).

### Alliant Has Suffered Substantial Harm as a Result of the Government's Refusal to Pay Amounts Owed

36. Alliant has suffered financial loss from the Government's actions. Alliant was owed monthly CSR reimbursements in October – December 2017 that have not been paid. Pursuant to the calculation methodologies in Section 155.1030(b)(3) and other applicable regulations, Alliant is owed $1,635,826.79 in unpaid CSR reimbursements for 2017.

37. Nonetheless, Alliant was still required by law to provide cost-sharing reductions to eligible insureds, despite not receiving the mandated reimbursement from the Government. This has caused Alliant to suffer significant financial losses.

### COUNT ONE

### Violation of Statutory and Regulatory Mandate to Make Payments

38. Alliant re-alleges and incorporates paragraphs 1 through 37 of the Complaint as if set forth fully herein.

39. The Government is obligated under Section 1402 of the ACA and/or 45 C.F.R. § 156.430 to pay issuers of QHPs the applicable cost-sharing reductions mandated by the ACA.

40. Alliant is an eligible QHP issuer under the ACA, and based on its adherence to the ACA and its notification of cost-sharing reduction amounts to CMS, satisfied the requirements for payment from the Government under Section 1402 of the ACA and 45 C.F.R. § 156.430.

41. The Government has failed to perform as it is obligated under Section 1402 of the ACA and 45 C.F.R. § 156.430.

42. The Government's failure to provide timely payments to Alliant is a violation of Section 1402 of the ACA and 45 C.F.R. § 156.430, and Alliant has suffered $1,635,826.79 in damages in payments for benefit year 2017 as a result of the Government's actions.

## COUNT TWO

### Breach of Implied-in-Fact Contract

43. Alliant re-alleges and incorporates paragraphs 1 through 37 of the Complaint as if set forth fully herein.

44. Alliant entered into a valid implied-in-fact contract with the Government regarding the Government's obligation to make full and timely CSR payments to Alliant in exchange for its agreement to become a QHP issuer and participate in the health insurance exchanges.

45. Section 1402 of the ACA, HHS's implementing regulations, the Government's actions in making CSR payments for benefit years 2014, 2015, 2016 and nine months of 2017, and the actions of agency officials with authority to bind the Government regarding their obligation to make CSR payments constitute a clear and unambiguous offer by the Government to make full and timely CSR payments to health insurers, including Alliant, that agreed to participate as QHP issuers in the ACA marketplaces. This offer evidences a clear intent by the Government to contract with Alliant.

46. Alliant accepted the Government's offer by agreeing to become a QHP issuer, accepting the obligations, responsibilities, and conditions the Government imposed on QHP issuers under the ACA, and proceeding to provide health insurance on the exchanges. Alliant satisfied and complied with its obligations and conditions that existed under the implied-in-fact contract.

47. The Government's agreement to make full and timely CSR payments was a significant factor material to Alliant's decision to participate in the health insurance exchanges.

48. The parties' mutual intent to contract is further confirmed by the parties' conduct, performance, and statements following Alliant's acceptance of the Government's offer, and the Government's repeated assurances that full and timely CSR payments would be made.

49. The implied-in-fact contract was also supported by mutual consideration: the CSR's reimbursement to alleviate the financial requirement that QHP issuers were forced to bear under the ACA was a critical consideration that significantly influenced Alliant's decision to become a QHP issuer and participate in the exchanges. Alliant, in turn, provided a real benefit to the Government by agreeing to become a QHP issuer and participating in the exchanges, as adequate insurer participation was crucial to the Government achieving the overarching goal of the ACA exchange programs – to guarantee the availability of affordable, high-quality health insurance coverage for all Americans by protecting consumers from increases in premiums.

50. The Government induced Alliant to participate in the health insurance exchanges in part by including the CSR payments in Section 1402 of the ACA and its implementing regulations, by which the Government committed to make health insurers whole financially for the mandated cost-sharing reductions.

51. The Government repeatedly acknowledged its commitments to provide financial assistance to QHP issuers and its obligations to make full and timely CSR payments to qualifying issuers through its conduct and statements to the public and to Alliant, which were made or ratified by representatives of the Government who had express or implied actual authority to bind the Government.

52. The Government's failure to make full and timely CSR payments to Alliant is a material breach of the implied-in-fact contract, and Alliant has suffered damages of $1,635,826.79 for benefit year 2017.

## PRAYER FOR RELIEF

Wherefore, Alliant requests the following relief:

A. That the Court award Alliant monetary relief in the amounts to which Alliant is entitled under Section 1402 of the ACA and 45 C.F.R. § 156.430; to wit, $1,635,826.79, principal;

B. That the Court award pre-judgment and post-judgment interest at the maximum rate permitted under the law;

C. That the Court award such court costs, litigation expenses, and attorneys' fees as are available under applicable law; and

D. That the Court award such other and further relief as the Court deems proper and just.

Dated: August 27, 2021                     Respectfully submitted,

                                           MORRIS, MANNING & MARTIN, LLP


                                           /s/ Eric A. Larson
                                           Eric A. Larson
                                           1600 Atlanta Financial Center
                                           3343 Peachtree Road, N.E.
                                           Atlanta, Georgia 30326
                                           (404) 233-7000
                                           (404) 365-9532 (fax)
                                           elarson@mmmlaw.com

                                           Attorney for Plaintiff